UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
-----------------------------------------------------------------------X
                                 :

UNITED STATES OF AMERICA,
                                 :

          -against-                   **1:24-CR-10279-JEK**

                                 :

DISHANT GUPTA,
                                 :

             Defendant.
-----------------------------------------------------------------------X

## **DEFENDANT DISHANT GUPTA'S SENTENCING MEMORANDUM**

      Now comes the defendant, Dishant Gupta, by and through undersigned counsel, who respectfully submit the following sentencing memorandum and position with respect to the defendant's sentencing guidelines and the requested variance therefrom.

## **INTRODUCTION**

      Dishant Gupta does not come before this Court to sugarcoat or make excuses for his crime.  Rather, as his near immediate acknowledgment of guilt illustrates, he deeply regrets and accepts unconditional blame for the securities offense for which he stands convicted.  But if any defendant deserves a non-custodial sentence – by variance from his advisory Guidelines range of 18-24 months – then surely this defendant does.  A virtual poster child for expanded sentencing discretion after United States v. Booker, 543 U.S. 220 (2005), Mr. Gupta is a first time, non-violent offender with a newborn child.  He is also likely to be deported following his conviction, adding an unknown period of imprisonment to any sentence imposed by the Court while he is held in an immigration detention facility, and separating him from his wife and infant son, who are both U.S. citizens.

In addition to his prompt admission of guilt in this case, Mr. Gupta quickly resolved his related enforcement action brought by the Securities and Exchange Commission[1] and transferred the entire agreed upon forfeiture amount to counsels' escrow account for payment to the government even before pleading guilty.[2]  Finally, despite his difficult childhood in India, Mr. Gupta has created a significant support network to aid him after this case – with nearly fifty character letters submitted on his behalf attesting to both the aberrational nature of his criminal conduct and the good prospects for his rehabilitation, minimizing the need for specific deterrence.

## THE ADVISORY SENTENCING GUIDELINES

On October 8, 2024, defendant Dishant Gupta pleaded guilty pursuant to a plea agreement to a one-count Information which charged him with Securities Fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff; and 17 C.F.R. § 240.10b-5.  See Presentence Investigation Report ("PSR") at ¶ 1.  Mr. Gupta faces no mandatory minimum sentence and a maximum of 20 years imprisonment.  PSR at p. 19.

As set forth in the PSR and set by U.S.S.G. §2B1.4(a), the base offense level for insider trading is eight.  PSR at ¶ 36.  Because the defendant received a profit of $262,000 from his trading activity, which is greater than $250,000, but less than $550,000, 12 levels are added.  PSR at ¶ 37; U.S.S.G. §2B1.1(b)(1)(G).  With three offense levels subtracted for acceptance of responsibility (U.S.S.G. §3E1.1) and two offense levels subtracted due to the defendant's lack of

---

[1] See Securities and Exchange Commission v. Gupta, 24-cv-12316 (D. Mass).

[2] Counsel is waiting for payment instructions from the government regarding the check for Mr. Gupta's forfeiture.  It will be promptly paid upon receipt.

criminal history (U.S.S.G. §4C1.1), the total offense level becomes 15, carrying an advisory

sentencing range in the Criminal History Category I of 18-24 months imprisonment.

## OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

On December 31, 2024, counsel filed objections to the PSR concerning the calculation of

the sentencing guidelines as well as biographical errors contained in the report. The government

concurred with the defendant's objection to Probation's guidelines calculation, specifically, the

assessment of a two-level enhancement for abuse of private trust. On January 22, 2025,

Probation agreed that its initial calculation was incorrect and the two-level enhancement should

not be applied. As the balance of Mr. Gupta's objections to the PSR have not been addressed,

they are reproduced below in full.

PSR at p. 3: Mr. Gupta has recently moved, his new home address is 306 Bencer Court,

Raritan, New Jersey 08869. A virtual home inspection for this address has been completed.

PSR at ¶ 55: The names Omesh Gupta and Anita Gupta are misspelled.

PSR at ¶ 58: Mr. Gupta's sister is Shweta Gupta.

PSR at ¶ 59: Unfortunately, the defendant's infant son, S.G., is not presently in good

health and has been recently hospitalized and diagnosed with pediatric failure to thrive due to his

low weight. While the child has since been discharged, if his condition does not improve, he

may be hospitalized again and receive the aid of a feeding tube.

PSR at ¶ 61: The defendant is prescribed 7.5 mg of meloxicam.

PSR at ¶ 63: Mr. Gupta volunteers at a food bank in Somerset, New Jersey.

## APPLICATION OF § 3553(a) FACTORS

Since the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), the Sentencing Guidelines have been rendered advisory in nature, leaving sentences to the district court's discretion, guided by the Guidelines and the other factors contained within 18 U.S.C. § 3553(a) and bounded by any applicable statutory minimum and maximum. This Section directs sentencing courts to "impose a sentence" that is "sufficient, but not greater than necessary, to comply with" the "need for the sentence ... to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; [and] to protect the public from further crimes of the defendant ...." 18 U.S.C. § 3553(a)(1)-(2) (emphasis supplied). In making this determination, courts are to consider "the nature and circumstances of the offense and the history and characteristics of the defendant ...." 18 U.S.C. § 3553(a)(1). Accordingly, we present the following for the Court's consideration.

The Immigration Consequences of Mr. Gupta's Conviction

Mr. Gupta is a lawful permanent resident of the United States, however, his felony conviction is likely to subject him to removal proceedings. Should he be incarcerated as a result of this case, Mr. Gupta's immigration status – despite him lawfully residing in the United States – will result in him being treated far worse than non-alien prisoners. Alternatively, a non-custodial sentence would permit him the option of either litigating to remain in the United States with his wife and infant son – who are both U.S. citizens – or alternatively, self-deporting and returning to India.

Specifically, as a foreign national, Mr. Gupta will not be permitted to spend any period of his incarceration in a Federal Prison Camp.  Despite the fact that he is a first time, non-violent offender, he will be automatically imprisoned at a Federal Correctional Institution, a facility far more restrictive and hazardous than otherwise normally required for a similarly situated offender. Additionally, Mr. Gupta will not be eligible to serve the final ten percent of his sentence in a halfway house or be eligible to receive credit for First Step Act programming.  Instead, he will be immediately transferred to an ICE custody at the end of his sentence while he awaits arrangements between the United States and India to process his deportation, which could take many months and confine him to privately-run and operated prisons that have consistently been under investigation over previous decades for poor management, lack of programming, lower-level medical care and heightened rates of assault.  See Tom Dreisbach, Government's own experts found 'barbaric' and 'negligent' conditions in ICE detention, August 16, 2023, NPR.org, available at: https://www.npr.org/2023/08/16/1190767610/ice-detention-immigration-government-inspectors-barbaric-negligent-conditions (last viewed January 20, 2025).

To be sure, Mr. Gupta's immigration status and its concomitant consequences may be considered mitigating factors by this Court pursuant to 18 U.S.C. § 3553(a) in fashioning an appropriate sentence.  See United States v. Hercules, 947 F.3d 3, 9 (1st Cir. 2020) ("Under appropriate circumstances, a defendant's potential deportation may properly be considered as part of a broader assessment of his history and characteristics pursuant to section 3553(a)(1)"); United States v. Romero, 17 CR 10199 (ADB), 2024 WL 457085, at *3 (D. Mass. February 6, 2024) (observing that sentencing court took into account "the likelihood of deportation"); see

also <u>United States v. Sanchez</u>, 433 F. App'x 44, 45 (2d Cir. 2011) (sentencing court correctly

reviewed § 3553(a) factors, including "argument that deportation would punish him").

<u>The Need to Avoid Unwarranted Sentenced Disparities</u>

In comparison with recent insider trading cases, a non-custodial sentence of probation or

house arrest for Mr. Gupta would not be out of place.  <u>See</u> 18 U.S.C. § 3553(a)(6); <u>Freeman v.</u>

<u>United States</u>, 131 S. Ct. 2685, 2694 (2011) (Sentencing Reform Act "aims to create a

comprehensive sentencing scheme in which those who commit crimes of similar severity under

similar conditions receive similar sentences").  Indeed, after excluding defendants who received

U.S.S.G. §5K1.1 downward departure motions from the government, the Judicial Sentencing

Information ("JSIN") in the PSR indicates that only 56% of defendants with an offense level of

17[3] and whose primary guideline was §2B1.4 received jail time, with an average variance of 17

months off the bottom of their 24-30 month guidelines range.  <u>See</u> PSR at p. 17.  In addition to

having an adjusted offense level of 15 – two levels lower than that used for the JSIN data in the

PSR – Mr. Gupta's $262,000 gain from the offense falls at virtually the bottom of the $250,000

to $550,000 applicable range in calculating his sentencing guidelines, another factor that favors

leniency.  Indeed, his gain is just $12,000 above a two level adjustment downward, to Zone C's

level 12 and an advisory sentencing range of 12-18 months.

Additionally, compared to the $262,000 that Dishant Gupta profited on his trades based

on material non-public information, individuals in this district who are convicted of committing

---

[3] Probation's initial draft of the PSR included a two-level enhancement for abuse of private trust, which it has since indicated does not apply in this case.  As an updated PSR has not yet been issued, the JSIN data cited herein refers to defendants with a total offense level of 17 and not 15.

insider trading or other securities offenses and sentenced to terms of imprisonment frequently

profit by substantially greater margins, and concomitantly, face higher sentencing guidelines.

And yet, they still commonly also receive significant downward variances from their guidelines

ranges.

For example, in United States v. Schottenstein, Judge Woodlock sentenced David

Schottenstein to 366 days imprisonment for an insider trading scheme that, according to the

government, netted the defendant and his two co-conspirators some $4.5M.  See United States v.

Schottenstein No. 1:22-cr-10005 (DPW), ECF Dkt. No. 71.  Unlike the three months of trading

activity in this case, "[o]ver a period of several years," Schottenstein "repeatedly obtained highly

confidential information about publicly traded companies from members of his own family ...

traded on the basis of that information, and ... tipped two of his friends."  Id. at ECF Dkt. No. 71.

Schottenstein's sentencing guidelines were 46 to 57 months imprisonment.

Further, in United States v. Tobin, et al., Judge Gorton sentenced defendant Milan Patel

to 15 months in prison for his role in a securities fraud scheme with an intended loss of $15M.

See United States v. Tobin, et al., 1:18-cr-10444, ECF Dkt. No. 135.  According to the

government, Patel's sentencing guidelines were 63 to 78 months imprisonment and he received a

significant downward variance despite his participation in a sophisticated fraud that involved the

use of shell companies and complex financial transactions such as reverse mergers.  Id. at ECF

Dkt. No. 89.

In United States v. Chan, et al., Judge Talwani sentenced defendant Schultz Chan to 36

months imprisonment – down from sentencing guidelines of 78-97 months – for his role in an tip

swapping insider trading scheme for which he was convicted after trial.  United States v. Chan, et

al., 1:16-cr-10268, ECF Dkt. No. 428.  According to the government – and in stark comparison to Mr. Gupta's prompt acceptance of responsibility in this case and corresponding SEC enforcement action – Chan obstructed justice and fabricated his testimony during his trial.  Id. at ECF Dkt. No. 339.  In all, Chan profited by some $919,005 in a scheme that netted $1,482,203 in illicit gains for him and his co-conspirators.  Id. at Dkt. 346.

Together, these cases support Mr. Gupta's contention that a significant downward variance from the guidelines – even prior to factoring in his personal history and characteristics – would be in line with other cases in this district.

Mr. Gupta's Childhood

Despite excelling in his education and eventually landing a high-paying job in the United States, Mr. Gupta did not have an easy childhood.  The defendant was born in India and raised in a "low-income area of New Delhi."  PSR at ¶ 55.  He resided in a two-bedroom apartment with 11 family members, and "slept on a floor for the first 13 years of his life."  Id.  As his younger sister, Shweta, explains in her letter to the Court: "Growing up, our family struggled financially, and life was often stressful.  My parents were always worried about paying for basic needs like food and education, which caused a lot of tension and arguments at home.  This difficult environment affected both me and Dishant."  November 14, 2024 Letter of Shweta Gupta, attached as Exhibit 1; see also PSR at ¶ 55 ("money was very tight").

In addition to his living conditions, growing up in New Delhi was not easy.  There were riots and protests as a result of political conflict at the time – and when he was five years old, a young Mr. Gupta watched a man self-immolate in the middle of a road.  Id.  He was also subjected to physical abuse during much of his childhood – he was hit by his parents with shoes

8

and belts – so badly once that he was required to miss school for five days.  PSR at ¶ 56.  When

Mr. Gupta was 16 years old, he left home and moved into a hostel to escape the abuse of his

parents and focus on his studies – and having no money, he supported himself by tutoring other

students – an arrangement that continued for some four years.  Id.  While certainly Mr. Gupta

was able to achieve academically and received his MBA from the Indian Institute of Technology

in 2010, he overcame an unusually difficult childhood in the process, a factor the Court may

consider in fashioning an appropriate sentence in this case as part of the "history and

characteristics of the defendant."  See 18 U.S.C. § 3553(a).

### The Character Letters

We have attached nearly 50 character letters in support of this submission, a number

reflecting the significant and meaningful role that Mr. Gupta has played in the lives of friends,

colleagues, and family members.  It would be impossible to include a letter from every individual

whom Mr. Gupta has positively influenced, and equally daunting to comment on every letter

received.[4]  Still, the myriad letters on which we do remark paint a consistent picture of a

dedicated and helpful colleague and friend, as well as a beloved family member who aided others

in their time of need.  See, e.g., January 8, 2025 Letter of Russell Kometer, attached as Exhibit 2

("quite literally, the most impressive colleague I encountered in my 25 years in the industry");

Letter of Amit Kumar, attached as Exhibit 3 ("has been like a brother, friend, a teacher and even

a father figure to me and many others").  Sadly, were it not for this sentencing, many of Mr.

Gupta's exceptionally good deeds probably would have gone unrecognized.

---

[4] Additional character letters are collected and attached hereto as Exhibit 36.

<u>A Dedicated Family Member</u>

To begin, many of the submitted letters comment on Mr. Gupta's dedication to both his immediate and extended family in the United States and abroad. Indeed, Mr. Gupta is praised in one letter as "the person who holds [their] family together," a sentiment echoed in many others. Letter of Rajat Gupta, attached as Exhibit 4.

Concerning his observations of the defendant's interactions with his wife, Mr. Gupta's brother-in-law informs the Court:

> It's hard to imagine her life without his presence, especially during this time when managing childcare on her own would be incredibly challenging. Dishant has been a pillar of support for my sister and her newborn baby. He helps her emotionally and mentally, always ensuring she feels supported. He takes full responsibility for house hold chores, child care, keeping track of the baby's feedings and needs so that my sister can focus on her job without worrying about their child's well-being.

<u>Id.</u> Friend Geetika Bhatia has similarly observed: "Despite the immense stress he's facing, Dishant has done everything possible to support his wife, Rishu, and their newborn son, S[]. He's been a hands-on dad, ensuring S[] is cared for while also being an emotional and practical support for Rishu during this challenging time." Letter of Geetika Bhatia, attached as Exhibit 5; <u>see</u> <u>also</u> November 1, 2024 Letter of Mayank Aggarwal, attached as Exhibit 6 ("Despite his inner turmoil, he remains steadfast for the sake of his loved ones, particularly his wife and young son"). Additionally, Palak Singhal confirms that "[d]espite his struggles, Dishant has remained a strong pillar for his family. He has been helping his wife with household chores, groceries, and taking care if their newborn child." Letter of Palak Singhal, attached as Exhibit 7.

Mr. Gupta's wife, Rishu, recounts in her letter when the defendant aided her in her most

difficult time – and his being infected with COVID due to his efforts:

> In 2021, during one of the darkest and most terrifying times of our
> lives, Dishant became my savior.  While visiting family in India, I
> contracted the COVID Delta variant-a time when the country was
> gripped by chaos and heartbreak.  Hospitals were overflowing,
> oxygen was a rare and precious commodity, and as my oxygen
> levels plummeted, I felt myself slipping away.  I was convinced I
> wouldn't survive.  <u>But Dishant refused to let me give up</u>.  He
> moved heaven and earth to find help, eventually securing a place
> for me in a medical camp when no other options were available.
> Despite the grave risks to his own health, he never left my side.
> <u>Night after night, he stayed with me, holding my hand, comforting
> me, and making sure I never felt alone in my darkest hours. He
> himself contracted COVID during the process and became severely
> ill, but he continued to care for me and stood by me</u>.  There were
> moments when I was certain I wouldn't make it-moments when the
> world felt like it was crumbling around me.  But Dishant's
> unwavering courage, his fierce determination, and his boundless
> love gave me the strength to keep fighting.  If I am alive today, it is
> because of him and his prayers.

Letter of Rishu Gupta, attached as Exhibit 8 (emphasis supplied).

Further, in his letter, Mr. Gupta's brother-in-law, Amit Kumar, recalls when the

defendant was there for him and his wife in their time of need:

> For me, he has become the one person I can call family here.
> When our son was born, what should have been the happiest
> moment of our lives quickly turned into a nightmare.  Our baby
> was diagnosed with a rare disease that required immediate surgery,
> followed by weeks of hospitalization. We were crushed-terrified
> for his life and unsure how we would make it through.
>
> Dishant didn't just stand by us; he carried us through those
> harrowing weeks.  From the moment we got the diagnosis, he was
> there-not just physically, but emotionally, in ways that words can't
> fully capture.  He showed up every single day, sitting with us at the
> hospital, offering comfort and strength when we felt like
> crumbling.  He stood by us through countless doctor visits,

late-night emergencies, and moments of despair.  He supported my wife, Shweta, through her fear and heartache as a new mother, while also ensuring I didn't feel like I had to shoulder the weight of it all alone.  His steady reassurance helped us believe we could get through this, even when everything felt impossible.

Even during our baby's post-surgery recovery, Dishant's presence never wavered.  He formed a bond with our son that was immediate and profound-talking to him softly, holding his tiny hand, and finding ways to bring light to the darkest days of our lives.  It was his love, his strength, and his unwavering belief in us that gave us the courage to face each day.  <u>By God's grace and the work of the doctors, our son's condition was resolved, but I can say without hesitation that we wouldn't have survived that year-long ordeal without Dishant</u>.

Ltr. of Amit Kumar, Ex. 3 (emphasis supplied).  Another brother-in-law, Rajat Gupta, similarly

informs of a time when the defendant came to his aid:

One example of his selflessness that I will never forget happened during the COVID-19 pandemic.  I was critically ill and needed urgent medication, while Dishant himself was battling COVID-19.  Despite his own condition, he went out of his way to secure the medicines I needed.  He also took care of my sister, who was hospitalized at the time, managing her treatment and ensuring she received proper care.  He did all this while neglecting his own health, and I still wonder how he found the strength to do it.

Ltr. of Rajat Gupta, Ex. 4 ("For me, Dishant is more than a brother-in-law").

Mr. Gupta's sister, Shweta, recalls in her letter of her brother's immense efforts to aid

their father when he was diagnosed with cancer:

When our father was diagnosed with Non-Hodgkin's Lymphoma (blood cancer), it was an incredibly difficult time for all of us.  Dishant didn't hesitate for a second to come back to India to be by our father's side and oversee his treatment.  This was not an easy choice for him because he had responsibilities and commitments in the US, but he knew his place was with his family.  Dishant did more than just visit the hospital and sit with our father; he took charge of organizing everything.  He researched the best hospitals,

> consulted with doctors, and made sure our father received the best
> treatment possible. He was working around the clock, burning the
> candle at both ends, coordinating with the medical staff, keeping
> track of appointments, and handling insurance and paperwork-all
> while managing his own remote work in a different time zone. His
> dedication was a source of comfort to our father and to the whole
> family during that tough time, making sure we had the support we
> needed to face each day.

Ltr. of Shweta Gupta, Ex. 1; see also November 11, 2024 Letter of Gaurav Garg, attached as

Exhibit 9 ("When his father was diagnosed with cancer in India, Dishant returned home to care

for him, managing everything with remarkable patience and dedication").

        Others who submitted letters have also taken note of Mr. Gupta's dedication to his father

and family in India. See, e.g., Ltr. of Rishu Gupta, Ex. 8 ("When Dishant's own father was

diagnosed with blood cancer, I saw his strength and resilience in a new light"). For example,

friend Raja Mishra recalls in his letter that when Mr. Gupta's father was diagnosed with cancer,

he "decided to take care of [him] [un]til ... his treatment was completed," despite the impact on

his career in that he needed to return to India for six to seven months. Letter of Raja Mishra,

attached as Exhibit 10. Friend Vikram Singh similarly lauds: "Dishant has always been the

backbone of his family. His father has been battling cancer for several years, and throughout this

difficult time, Dishant has been a pillar of strength for his family, providing both emotional and

financial support." October 24, 2024 Letter of Vikram Singh, attached as Exhibit 11. And friend

Vivek Jain likewise recalls: "some years back, his father was diagnosed with cancer, he took

leave[] and traveled back [to India] to take care of all the arrangements for his treatment and ...

ensure that his father is in good spirit[s] and health." Letter of Vivek Jain, attached as Exhibit

12.

Finally, concerning her own experience with Mr. Gupta's giving nature, the defendant's sister explains how he aided her after she had "typhoid twice in a row" in her last year of college and he helped her get back on her feet:

> I was so weak that even getting out of bed was difficult, and I felt overwhelmed by the pressure. Dishant made the big decision to cancel an important work trip to stay in the US and take care of me. He did more than just help me with daily activities, made sure I had the right medications and kept me calm and positive, even when I was frustrated with being sick and behind on my studies. He also spent hours each day reviewing my exam material with me, quizzing me, and explaining concepts I was struggling with.

Ltr. of Shweta Gupta, Ex. 1.

<u>A Reliable Friend and Colleague</u>

Multiple of the submitted letters appended to this submission were also sent by Mr. Gupta's prior work colleagues, who recall his dedication to them and the lasting friendships that followed. <u>See</u>, <u>e.g.</u>, Letter of Vishwavijay Singh, attached as Exhibit 13 ("He consistently went above and beyond to meet deadlines, solve problems, and help his colleagues – often stretching himself to make sure that tasks were completed to the highest standard"); November 1, 2024 Letter of Vinamra Singhania, attached as Exhibit 14 ("I regarded him as my most matured team member").

Indeed, Mr. Gupta is praised in multiple letters as "the kind of person who helps others without expecting anything in return." Letter of Ankaj Goel, attached as Exhibit 15. For example, in his letter to the Court, former colleague Russell Kometer lauds:

> Dishant consistently demonstrated an exceptional level of intelligence and problem-solving ability. His brilliance was evident in the innovative solutions he brought to complex challenges, and he was always willing to help anyone who needed

14

it, enabling them to shine and succeed in their roles.  Despite his remarkable intellect, Dishant remained humble and approachable, always willing to share his knowledge and assist others.

One of the most admirable qualities of Dishant is his unwavering work ethic.  He works incredibly hard, often going above and beyond what is required to ensure the success of projects and the well[-]being of others.  His dedication is not limited to his own tasks; he is always willing to sacrifice his own time to help others shine.  Whether it is working long hours to assist a colleague with a difficult problem or mentoring new team members, Dishant consistently puts the needs of others before his own.

Ltr. of Russell Kometer, Ex. 2; see also November 7, 2024 Letter of Kaushal Panjwani, attached as Exhibit 16 ("Dishant was always there, offering moral and technical support when I needed it most").  And in his letter, friend and former colleague Ankush Mahajan recalls: "In 2023, when I was laid off from my role, [Dishant] helped me tremendously in networking with people he knew in the industry and also provided consistent emotional support.  His guidance and advice have been invaluable to me."  Letter of Ankush Mahajan, attached as Exhibit 17 (emphasis supplied).

Another former colleague, P.K. Rajagopal, who worked with Mr. Gupta for five years, recalls an instance demonstrative of his dedication to his co-workers in his letter to the Court:

In one instance in 2021, while on vacation during the Covid pandemic, both he and his wife came down with very harsh covid symptoms; [h]is wife had to be admitted to [i]ntensive [c]are and was on oxygen.  He was also in bad shape himself.  Despite his personal circumstances, he 'burned the candle on both ends' putting on a Herculean effort to compile critical information that was needed by Senior Leadership on our team, while simultaneously tackling his personal circumstances.  Coworkers across the firm relied on his insights, dedication and 'can do' attitude.  I cannot even imagine him shirking his responsibilities towards his family, friends or colleagues.  It is these qualities that attracted everyone he encountered.

November 24, 2024 Letter of P.K. Rajagopal, attached as Exhibit 18 (emphasis supplied).

15

Recounting how the defendant came to his aid when he was "completely alone in this country" and "bedridden with a severe flu," friend and former colleague Amit Verma writes: "I'll never forget how he took me to the doctor multiple times, missing work to care for me, and even stayed at my house overnight just to ensure I was okay.  He brought me meals and medicine, and even placed cold packs on my forehead ...."  Letter of Amit Verma, attached as Exhibit 19; see also Letter of Neha Bhasin, attached as Exhibit 20 (recalling that the defendant cared for her son with a "weakened immune system," and "spent sleepless nights helping him recover [from illnesses]").  And Ankit Kohli recalls in his letter that when his mother was diagnosed with cancer, the defendant supported him "both professionally and personally."  Letter of Ankit Kohli, attached as Exhibit 21 ("His kindness, patience, and unwavering encouragement not only helped me navigate through one of the hardest times in my life, but also reflected his selfless and compassionate nature"); see also November 3, 2024 Letter of Suresh Yadav, attached as Exhibit 22 ("I have known Dishant for his passion to drive positive change in other's lives").

Further, friend Kapil Rathi writes that when he first arrived in the United States, it was Mr. Gupta who helped him and his family acclimate:

> With so many unknowns and challenges as new immigrants, Dishant was there to provide emotional strength and practical support.  Despite his own demanding work schedule, he took the time to guide us, showing us where to shop and helping us adjust to life here.  For months, when I couldn't drive, he made countless trips to ensure my family had everything we needed.  Patient and encouraging, he even helped me develop my driving skills, a task he didn't have to take on but did so with kindness and understanding.  His generosity is unmatched, and his true gift to me was helping me stand on my own feet, empowering me to not just survive, but thrive.  His unwavering support and genuine care are a testament to his character, showing that he is someone who lifts others up with no expectation of anything in return.

November 17, 2024 Letter of Kapil Rathi, attached as Exhibit 23 (emphasis supplied); see also

Letter of Kratika Gaur, attached as Exhibit 24 ("gestures of goodwill and warmth continue[] to

amaze me").  Similarly, Pinaki Biswas praises: "As someone new to the United States at the

time, I cannot overstate the significance of having such a dependable friend who would assist my

family with everyday needs, from grocery shopping to providing emotional support during my

absence [on work trips]."  Letter of Pinaki Biswas, attached as Exhibit 25; see also Ltr. of

Kaushal Panjwani, Ex. 16 ("the type of person who will go out of his way to help others without

expecting something in return").

Another friend, Shekhar Gupta (no relation), provides a similar account of the

defendant's helpfulness upon arriving to the United States in his letter to the Court, writing:

> When we first came to U.S., Dishant helped my family and me
> settle into the community.  He was always there to offer support in
> ways both big and small, showing a generosity and kindness that
> was invaluable to us during our early days.  Since I didn't have a
> driving license and car during my first few months in US, he would
> readily drive us for essential errands like grocery shopping, never
> hesitating or making us feel like a burden. Dishant's warmhearted
> nature went far beyond simple gestures-he genuinely cared about
> our well-being and went out of his way to make our transition
> smoother.

October 28, 2024 Letter of Shekhar Gupta, attached as Exhibit 26; November 17, 2024 Letter of

Pooja Mundra, attached as Exhibit 27 ("In those challenging early days [in the United States],

Dishant stepped' in to help me get settled, offering not just practical assistance but also the

emotional strength that my family and I desperately needed").

Pooja Mundra writes in her letter of an incident she believes "perfectly captures Dishant's

selfless and caring nature," recalling:

> It was a hectic morning, and I was rushing to get my 4-year-old to pre-K when I suddenly discovered I had a flat tire.  My husband was out of town and unavailable, leaving me feeling stranded, worried, and overwhelmed about how to keep my child safe and get him to school on time. In that moment of distress, I immediately thought of Dishant-because I knew he was the kind of person who would never hesitate to help, no matter the circumstances.  True to his character, Dishant didn't disappoint. Even though he was in the middle of his own business meeting, he stepped away without hesitation to come to our rescue.  He not only took care of the flat tire but also ensured my child was safely dropped off at school.  It wasn't just about the actions he took-it was the intention behind them.  Dishant didn't simply help because he could; he helped because he genuinely cares about the people in his life.  He has a rare ability to prioritize the well-being of others, even when it comes at a cost to himself.

Id. (emphasis supplied); see also Letter of Lakshay Bhatia, attached as Exhibit 28 ("There were times when I had to travel for work, and Dishant was there to help my elderly mother ....  He took her to doctor's appointments and made sure she had everything she needed").

Concerning when the defendant was there for her during her time of need, friend Anupam Rathi recalls in her letter to the Court:

> Recently, I went through one of the most difficult times of my life when I lost my mother.  The grief of her passing was overwhelming, and to make matters worse, my citizenship application was in process, leaving me uncertain about how to return to India to attend her last rites and support my grieving father.  During that emotional turmoil, Dishant stepped in without hesitation.  He tirelessly contacted the embassy, scoured forums for advice, searched for flights, and essentially coordinated every detail to ensure I could make the trip.  His actions went far beyond mere assistance; they reflected a depth of care and empathy that is rare to find.

Letter of Anupam Rathi, attached as Exhibit 29.  Similarly, former colleague Ashwani Chawla recalls a "particularly difficult time" for him when his father was hospitalized:

> I had to urgently travel back to my hometown, and in the midst of that crisis, Dishant was the only one to reach out personally. He called me to offer support, told me to focus on my family, and even offered to help me connect with his contacts to ensure my father received the best possible care.  His empathy and willingness to step in during such a challenging time left a lasting impression on me. It is rare to encounter someone who extends such genuine care beyond the workplace, and this is a testament to his character.

Letter of Ashwani Chawla, attached as Exhibit 30; <u>see also</u> Ltr. of Vivek Jain, Ex. 12 ("He is one of the kindest, most helpful, dependable and understanding persons I have ever met").

As described in his letter to the Court, when friend Mayank Aggarwal's wife was diagnosed with metastatic breast cancer, Mr. Gupta was immensely helpful and supportive:

> Dishant immediately shared his perspective and was a huge moral support for me and my family as he has seen this disease very closely as his father is a cancer survivor.  Dishant was also present with me, my wife, my father-in-law and another friend during one of our zoom meets with renowned California based medical breast oncologist to give me moral support (on my request) and to follow up or ask any important follow up question with doctor in case I or my wife missed asking it.

Ltr. of Mayank Aggarwal, Ex. 6; <u>see also</u> Letter of Alok Goel, attached as Exhibit 31 ("He has touched my life so profoundly, and I know he has the capacity to continue contributing positively to the lives of others").

<u>Dedication to the Community</u>

Mr. Gupta immigrated to the United States in 2013 and has become deeply involved in not just the lives of his friends and family members, but also in giving back to others.  Friend Priyank Mathur summarizes:

> Dishant is deeply engaged in efforts to support and nurture the community.  His philanthropic nature embodies the phrase "[h]elp those in need without the greed."  Dishant has consistently shown

19

> generosity and altruism by organizing charitable events and
> volunteering for causes that benefit underprivileged individuals.  A
> recent example of his selflessness was when he organized a meal
> for over 100 families in need and donated seasonal clothing to help
> them through a cold front.  His work with organizations such as
> Habitat for Humanity during the aftermath of Tropical Storm Ida in
> New Jersey is another testament to his commitment to making a
> difference.  Additionally, Dishant has volunteered countless hours
> teaching underprivileged children through free educational
> programs, helping them compete academically. His dedication to
> both his career and his community demonstrates his desire to
> contribute meaningfully to American society.

Letter of Priyank Mathur, attached as Exhibit 32; see also Letter of Jayshree Shingala, attached as

Exhibit 33 ("personally witnessed ... helping elderly neighbors to ... clear the snow").  Further, as

retold by Gaurav Garg, "during the second wave of COVID-19 in India, Dishant went to great

lengths to source oxygen machines for elderly and vulnerable patients – even while he was

hospitalized himself."  Ltr. of Gaurav Garg, Ex. 9.

### Regret for his Criminal Conduct

Finally, included among the letters appended to this submission are multiple observations

of Mr. Gupta's sincere remorse and regret for his crimes.  See, e.g., Ltr. of Ankush Mahajan, Ex.

17 ("I have witnessed his remorse firsthand and believe that he is truly committed to making

amends, learning from his experience and emerging as a more valuable member of society").

For example, friend Amit Verma notes: "When I spoke to, him, he was heartbroken.  He

broke down, telling me how deeply sorry he was ...."  Ltr. of Amit Verma, Ex. 19; see also Ltr. of

Rajat Gupta, Ex. 4 ("He takes full responsibility for his actions and regrets them deeply").

Former colleague Vishwavijay Singh similarly notes that Mr. Gupta has "expressed his regret to

[him] with genuine shame," (Ltr. of Vishwavijay Singh, Ex. 13) and Ankit Kohli confirms:

"Dishant has expressed profound remorse for his actions ...."  Ltr. of Ankit Kohli, Ex.21; <u>see</u> <u>also</u> Ltr. of Raja Mishra, Ex. 10 ("very remorseful").  Friend Geetika Bhatia writes in her letter that the defendant "has expressed immense regret," (Ltr. of Geetika Bhatia, Ex. 5) and Vineet Rathi echoes that "Dishant has expressed deep remorse for his actions and is determined to move forward as a better person."  Letter of Vineet Rathi, attached as Exhibit 34.

Concerning his experience in learning of the defendant's insider trading case, former colleague Bart McPherson was in "absolute shock," adding that when he discussed the matter with Mr. Gupta, he was "met with a deeply remorseful and reflective person."  Letter of Bart McPherson, attached as Exhibit 35 ("Dishant expressed genuine regret for his actions, especially considering the profound impact they would have on his family and newborn son"); <u>see</u> <u>also</u> Ltr. of Mayank Aggarwal, Ex. 6 ("Dishant has expressed sincere remorse").  Finally, sister-in-law Palak Singhal confirms that Mr. Gupta "blames himself for the pain caused to [his] family" and "deeply regrets what has happened ...."  Ltr. of Palak Singh, Ex. 7; <u>see</u> <u>also</u> Ltr. of Jayshree Shingala, Ex. 33 ("Dishant has expressed deep remorse for his actions").

## CONCLUSION

Defendant Dishant Gupta comes before this Court asking for mercy. A life filled with hard work and dedication to his family members and friends will be forever tarnished by his criminal choices. Nevertheless, as the powerful enclosed letters reveal, Mr. Gupta is an uncommonly decent and giving man who unlike many defendants has made extraordinary efforts to help others throughout his life, when no one was watching, when he had no need to impress a judge deciding his fate. For these reasons and the others stated herein – including his prompt acceptance of responsibility and lack of criminal history – a non-custodial sentence is respectfully requested.

Dated:          New York, New York
                January 23, 2025

**JEFFREY LICHTMAN, ESQ.**
LAW OFFICES OF JEFFREY LICHTMAN
441 LEXINGTON AVENUE, SUITE 504
NEW YORK, NEW YORK 10017
Ph: (212) 581-1001
Fx: (212) 581-4999
E: jhl@jeffreylichtman.com

**JEFFREY EINHORN, ESQ.**
LAW OFFICES OF JEFFREY LICHTMAN
441 LEXINGTON AVENUE, SUITE 504
NEW YORK, NEW YORK 10017
Ph: (212) 581-1001
Fx: (212) 581-4999
E: einhorn@jeffreylichtman.com

*Attorneys for Defendant Dishant Gupta*

**CERTIFICATE OF SERVICE**

I, Jeffrey Lichtman, hereby certify that on this date, January 23, 2025, a copy of the

foregoing document has been served via ECF on all registered participants.

JEFFREY LICHTMAN